Demme ULLOA, Plaintiff,

v.

UNIVERSAL MUSIC AND VIDEO DISTRIBUTION CORP.; Island Def Jam Music Group; Roc–A–Fella Records, LLC; Shawn Carter d/b/a "Jay Z;" John/Jane Doe; and Doe Entity, Defendants.

No. 01 Civ. 9583(BSJ).

United States District Court, S.D. New York.

Jan. 14, 2004.

---

John P. Bostany, Bostany Law Firm, New York City, for plaintiff.

Andrew H. Bart, Pryor Cashman Sherman & Flynn, Christine Lepera, Sonnenschein Nath & Rosenthatl, New York City, for defendants.

## Opinion

JONES, District Judge.

Plaintiff Demme Ulloa brings this action against Defendants Universal Music and Video Distribution Corp., Island Def Jam Music Group, Roc–A–Fella Records, LLC, and Shawn Carter (collectively "Defendants") for copyright infringement, false designation of origin under the Lanham Act, unjust enrichment, a declaration of joint authorship, and an accounting of all relevant sales. On April 15, 2002, Defendants moved for summary judgment, or, in the alternative, to bifurcate the case. Plaintiff opposed Defendants' motion and made a cross motion for summary judgment. As explained below, the Court grants Defendant's motion for summary judgment, in part, and denies Plaintiff's motion for partial summary judgment.

## FACTS

The following facts are either undisputed or as alleged by Plaintiff. In April 2001, Plaintiff Demme Ulloa was invited to Base–Line Recording Studios by Samuel Barnes. Mr. Barnes is a friend and colleague of Defendant Shawn Carter, who is professionally known as "Jay Z." At the time Ms. Ulloa arrived at the recording studio, Mr. Carter was recording a song, which was ultimately released on Mr. Carter's album Blueprint, titled "Izzo (H.O.V.A.)" ("the Izzo song"). Mr. Barnes produced another song on the Blueprint album, (Barnes Decl. ¶ 4), and although he did not produce the Izzo song, Mr. Barnes told Ms. Ulloa that he was producing the Izzo song. (Ulloa Dep. at 209–10).

The Izzo song consisted of rapped lyrics by Mr. Carter, and an instrumental riff,[1] which previously appeared in the Jackson Five song, "I Want You Back" ("the Instrumental Phrase"). While at the studio listening to the unfinished version of the Izzo song, Ms. Ulloa created a countermelody to the Instrumental Phrase and spontaneously began singing this countermelody with the words from the rapped portion of the song. (Ulloa Aff. ¶ 2.) Mr. Barnes heard Ms. Ulloa singing this countermelody ("the Vocal Phrase"), and suggested that she sing the Vocal Phrase for Mr. Carter. Mr. Carter liked the Vocal Phrase and asked Ms. Ulloa to record the Vocal Phrase for possible inclusion in the Izzo song. (Hearing Tr. at 89).

While she was at the recording studio, Ms. Ulloa did not discuss any terms for the possible use of the Vocal Phrase; however, she later discussed the possibility of receiving credit as a vocalist and appearing on the music video with Mr. Barnes. (Hearing Tr. at 51–52, 55).[2] It was not decided at the time that Ms. Ulloa record-

---

1. The instrumental riff, referred to in this opinion as the Instrumental Phrase, consisted of ten notes performed by a stringed instrument or synthesizer keyboard, which was created by the producer of the Izzo song. (Def. Mem. at 8).

2. This Court conducted an evidentiary hearing on November 16, 2001, with respect to Plaintiff's motion for a preliminary injunction, which was denied.

ed the Vocal Phrase whether her recording would be included in the Izzo song. (Hearing Tr. at 13, 52).

Ms. Ulloa spoke to Mr. Barnes on several occasions after she recorded the Vocal Phrase. Mr. Barnes assured Ms. Ulloa that she would receive credit as a vocalist on the album if her recording was used, (Hearing Tr. at 81), but on another occasion informed her that her recording might not be used, and a more established performer might be asked to record the Vocal Phrase. (Hearing Tr. at 11). After the recording session, Ms. Ulloa continued to contact Mr. Barnes to negotiate terms for the use of her recording. (Ulloa Aff. ¶ 6). When Mr. Barnes stopped returning Ms. Ulloa's telephone calls, Ms. Ulloa contacted the American Federation of Television and Radio Artists ("AFTRA") in an attempt to establish communication with the Defendants. (Ulloa Dep. at 188). AFTRA is a national labor union that negotiates collective bargaining agreements, provides benefits to its members, and resolves disputes between its members and their employers. *See www.aftra.com/whatis.html.* Although Ms. Ulloa was not a member of AFTRA, (Ulloa Aff. ¶ 7), and therefore presumed that AFTRA was not entitled to collect payments on her behalf, (Ulloa Dep. at 237), an AFTRA employee requested payment for Ms. Ulloa's work on the Izzo song from Defendants.

When her attempts to contact Defendants through AFTRA failed, Plaintiff retained counsel. After receiving several communications from Plaintiff's counsel regarding their alleged copyright infringement, (Pl.Exs.5–6), Defendants remitted payment to AFTRA for Plaintiff's work on the Izzo song. Plaintiff's counsel returned these checks to AFTRA and filed this suit.

**3.** Plaintiff does not claim any copyright in the

*DISCUSSION*

Defendants seek summary judgment with respect to Plaintiff's copyright infringement, joint authorship, Lanham Act and Unjust Enrichment claims. Defendants also move to bifurcate the trial into liability and damages phases. Plaintiff cross-moves for summary judgment with respect to certain aspects of her copyright infringement claim. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's joint authorship and Lanham Act claims. All other motions are DENIED.

**A. *Copyright Infringement***

■ Plaintiff alleges the infringement of two separate copyrights: her copyright in the sound recording of her performance of the Vocal Phrase and her copyright in the musical composition of the Vocal Phrase.[3] (Compl. ¶ 1). "Copyright protection extends to two distinct aspects of music: (1) the musical composition, which is itself usually composed of two distinct aspects— music and lyrics; and (2) the physical embodiment of a particular performance of the musical composition, usually in the form of a master recording." *Staggers v. Real Authentic Sound,* 77 F.Supp.2d 57, 61 (D.D.C.1999); *see also* 6 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 30.03 (2003) ("Copyright ownership of the physical embodiment of the performance of a musical composition (*e.g.,* a master recording) is distinct from the ownership of the copyright in the musical composition itself").

Defendants claim that they are entitled to summary judgment on Plaintiff's copyright infringement claim based upon three alternative theories: (1) the melody of the Vocal Phrase is unoriginal and therefore unprotectable as a matter of copyright law,

lyrics of the Vocal Phrase.

(2) any copyright in the sound recording of the Vocal Phrase belongs to Defendant Roc–A–Fella Records as the author of a work for hire, and (3) Plaintiff licensed her interests in the composition and the sound recording of the Vocal Phrase to Defendants. The Court is not persuaded by any of these arguments.

In response, Plaintiff moves for partial summary judgment with respect to "(1) copyright infringement of [Plaintiff's] voice and (2) copyright originality of the subject melody." (Pl. Mem. at 1). Because there are disputed issues of fact regarding the employment status of the Plaintiff and the originality of the Vocal Phrase, Plaintiff's cross motion for partial summary judgment is denied.[4]

### 1. Originality

 Originality—*i.e.*, "distinguishable variation" and the presence of a "minimal element of creativity"—is a prerequisite to copyright protection. *L. Batlin & Son, Inc. v. Snyder*, 536 F.2d 486, 490 (2d Cir. 1976) (internal quotations and citations omitted). The Second Circuit has characterized the test of originality as "modest, minimal," and "a low threshold." *Durham Indust., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.1980) (internal quotations and citations omitted). Here, Plaintiff created the Vocal Phrase as a "counter-melody" to the Instrumental Phrase. (Hearing Tr. at 4). Defendants argue that the Vocal Phrase is not entitled to copyright protection because it is derived from the Instrumental Phrase and contains no distinct protectable expression. (Def. Mem. at 8). That the Vocal Phrase was derived from the Instrumental Phrase is no bar to copyrightability, as derivative works are explicitly protected in the Copyright Act. *See* 17 U.S.C. § 103. Just as courts in this district have found that a harmony added to a preexisting melody is not unoriginal as a matter of law, *Tempo Music, Inc. v. Famous Music Corp.*, 838 F.Supp. 162, 167–69 (S.D.N.Y.1993), this Court declines to find that a countermelody is unoriginal as a matter of law.[5]

The parties have submitted reports of experts as well as musical and written renditions of the specific tones in the Vocal and Instrumental Phrases in support of their respective arguments regarding the originality of the Vocal Phrase. It would be improper for this Court, on a motion for summary judgment, to draw its own conclusions from this competing evidence regarding the originality of the Vocal Phrase.[6] *See Repp v. Webber*, 132 F.3d

---

**4.** Plaintiff's cross motion for summary judgment states that, if "there are disputed issues of material fact that could cause a 'reasonable jury' to resolve, either way, the questions of work-for-hire, or implied license, then summary judgment should be denied *to all* as to the infringement of [Ms. Ulloa's] voice and melody." (Pl. Mem. at 3) (emphasis added). As the Court finds that material facts are in dispute, Plaintiff's cross motion for summary judgment is denied.

**5.** Webster's Third New International Dictionary (Unabridged) defines a countermelody as "a secondary melody sounded or to be sounded simultaneously with the principal one."

**6.** Defendants also argue that the Vocal Phrase is not copyrightable because many similar

examples of musical phrases exist that predate the Vocal Phrase. (Def. Mem. at 10–11). However, the cases relied upon by Defendants for this copyrightability argument, *Jean v. Bug Music, Inc.*, 2002 WL 287786 (S.D.N.Y. Feb.27, 2002) and Def. Reply Mem. at 9–10 (collecting cases), are copyright infringement cases—that is, cases that involved a factual dispute whether a portion of a protected work appeared in another work. Here, Defendants do not dispute whether Plaintiff's work appears in the Izzo song, rather they dispute that the Plaintiff's work is original enough to be protected. As the Second Circuit explained in *Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 34 (2d Cir.1982), "[t]he standard for sufficient originality is whether a work contains some substantial,

882 (2d Cir.1997). A reasonable factfinder, presented with these materials, could find either the presence or absence of the degree of originality required to confer copyrightability.

## 2. Work for Hire

■ The Copyright Act carves out an exception for "works made for hire." 17 U.S.C. § 201(b). Generally, copyright ownership vests in the author of a work; however, where a work is made for hire, the author's employer is considered the author and owns the copyright in the work, unless there is a written agreement to the contrary. *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 737, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). Defendants claim that the sound recording of the Vocal Phrase was a work for hire, as Ms. Ulloa was an employee of the Defendants and the Vocal Phrase was recorded within the scope of her employment.

In determining whether Ms. Ulloa was an employee of the Defendants when she recorded the Vocal Phrase, this Court must look to the general common law of agency, as well as the factors identified in *Reid.*[7] However,

A court must disregard those factors that, in light of the facts of a particular case, are (1) irrelevant or (2) of 'indeterminate' weight—that is, those factors that are essentially in equipoise and thus do not meaningfully cut in favor of either the conclusion that the worker is an employee or the conclusion that he or she is an independent contractor.

*Eisenberg v. Advance Relocation & Storage, Inc.,* 237 F.3d 111, 114 (2d Cir.2000).

The Second Circuit has identified five factors that "will almost always be relevant and should be given more weight in the analysis, because they will usually be highly probative of the true nature of the employment relationship." *Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir.1992). These factors are: (1) the hiring party's right to control the manner and means of creation; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party. *Id.* Questions of historical fact relevant to applying each of the *Reid–Aymes* factors are for the finder of fact, but the ultimate determination, on settled facts, of whether a work qualifies as a work-for-hire is a question of law. *Langman Fabrics v. Graff Californiawear,* 160 F.3d 106, 111

---

not merely trivial, originality. The standard for copyright infringement, by contrast, is whether the defendant's work is substantially similar to the plaintiff's work." *Eden Toys,* 697 F.2d at 34 (internal quotations and citations omitted). Indeed, the very case that Defendants rely upon in their Memorandum of Law distinguished cases assessing copyright validity and ownership from cases assessing substantial similarity in an infringement context. *Jean v. Bug Music, Inc.,* 2002 WL 287786, at *6. Thus, Defendants' arguments regarding the similarity of the Vocal Phrase to other musical works in the public domain are not relevant in an originality inquiry where, as here, copying is conceded.

7. The *Reid* factors include: (1) the hiring party's right to control the manner and means by

which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party. *Reid,* 490 U.S. at 751–52, 109 S.Ct. 2166.

(2d Cir.1998). Here, the *Reid–Aymes* factors, when applied to the facts as alleged by Plaintiff, do not support a finding that Ms. Ulloa was an employee of the Defendants as a matter of law.

■ The first factor—the hiring party's right to control the manner and means of creation—weighs against finding an employment relationship. Plaintiff arrived at the studio as a guest. She developed the Vocal Phrase herself—without input from Defendants—and "used total discretion in creating her melody as well as the length of the vocal phrase." (Pl's 56.1 Statement ¶ 14). The only direction Ms. Ulloa received from the Defendants was an instruction that she was singing the lyrics in the wrong order. (Hearing Tr. at 57–58). Defendants' factual contentions to the contrary are irrelevant as they are the party moving for summary judgment.

The second factor—the skill required to create the work—also weighs in Plaintiff's favor. Defendants argue that the limited nature of Plaintiff's prior training and professional experience suggests that she is not a "highly skilled" musician. (Def. Mem. at 15). However, this argument mischaracterizes the skill factor. In evaluating whether skill is required to create a work, the skill necessary to perform the work—not the relative inexperience of the individual—is relevant. *Aymes*, 980 F.2d at 862. Merely listening to the song in question leads the Court to conclude that Ms. Ulloa possesses a talent for singing that exceeds the ability of the average person.

Defendants do not claim to have provided Plaintiff with employee benefits. Therefore, the third factor weighs against finding an employment relationship.

The fourth factor, the tax treatment of the hired party, forms the focal point of Defendants' work for hire argument. It is not disputed that the Plaintiff completed a W–4 form and Defendants subsequently withheld taxes from paychecks that were transmitted to the Plaintiff via AFTRA. However, assuming the Plaintiff's version of events is correct, this form is not indicative of an employment relationship. Once Plaintiff realized that her voice was featured on the song, she sought to contact the Defendants through AFTRA, whom she understood to be an organization that assists artists in obtaining royalty payments. (Ulloa Dep. at 198). AFTRA told Plaintiff that, before they would assist her in her attempt to contact the Defendants, she had to complete a W–4 tax form. (Ulloa Dep. at 205, 222–23). Because Plaintiff was under the impression that she had to complete the form in order to obtain assistance in her quest to contact Defendants, the Court does not believe it is indicative of Plaintiff's belief that she was an employee of Defendants.

Also, because the tax treatment of the Plaintiff largely occurred after litigation was threatened, it provides little, if any, persuasive evidence of the parties' contemporaneous belief of an employment relationship [8] and, consequently, this factor is assigned very little weight in the *Reid–Aymes* analysis. Moreover, Defendants received at least two letters from Plaintiff's counsel, advising them of their failure

---

**8.** In addition to the *Reid–Aymes* factors, a court may consider other relevant factors, "so long as they are drawn from the common law of agency that *Reid* seeks to synthesize." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 n. 1 (2d Cir.2000). In this respect, the Court finds that a relevant factor

to consider is whether the parties believed there was an employment relationship. *See* Restat.2d of Agency, § 220 cmt. h. (identifying "the belief by the parties that there is a master and servant relation" as a factor indicating a master servant relationship).

to acknowledge Ms. Ulloa's contribution to the Izzo song and their infringement on her copyright, before Defendants remitted any payment to AFTRA. (Pl.Exs.5–6). Indeed, Defendants delayed so long before remitting payment that they violated AFTRA's rules regarding payments and were forced to pay a late penalty. (Archie Dep. at 104; Def. Ex. BB).

The fifth factor, whether the hiring party has the right to assign additional projects to the hired party, also weighs against an employment relationship. Ms. Ulloa was only present at the studio as a guest. Even assuming Defendants "assigned" this project to her, they did not have the right to "assign" other projects.

Having examined the *Reid–Aymes* factors and drawn all inferences in favor of the Plaintiff, the Court cannot conclude as a matter of law that either the musical composition or the sound recording of the Vocal Phrase were created as works for hire.

### 3. License

■ A copyright owner who grants a license waives her right to sue the licensee for copyright infringement. *Graham v. James*, 144 F.3d 229, 236 (2d Cir.1998). Defendants argue that Plaintiff's conduct gave rise to an implied license for Defen-

dants to use the Vocal Phrase and the sound recording in the Izzo song.

The Second Circuit has cautioned that an implied license will be found "only in 'narrow' circumstances where one party 'created a work at the [other's] request and handed it over, intending that [the other] copy and distribute it.'" *Smith-Kline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21, 25 (2d Cir.2000) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990)). Here, Plaintiff alleges that she created the Vocal Phrase "spontaneously" rather than at Defendants' request.[9] (Ulloa Aff. ¶ 2). Also, Plaintiff recorded the Vocal Phrase while a guest at the Defendants' studio session; she did not create it elsewhere and then "hand it over" to Defendants.

Defendants bear the burden of proving the existence of a license. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir.1995). In order to establish an implied license, as for any implied contract, they must prove that there was a meeting of the minds.[10] *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 317 (S.D.N.Y.2000). Here, it is clear that there was no meeting of the minds with respect to the use of the Vocal Phrase. Ms. Ulloa had several discussions with Mr. Barnes—an apparent agent of Mr. Carter[11]—with respect to

---

9. Although Plaintiff has conceded that she *recorded* the Vocal Phrase at the Defendants' request, (Pl. Mem. at 28–29), she has maintained that her creation of the Vocal Phrase composition was "spontaneous."

10. Although neither party addressed this issue in their papers, it appears that this question must be analyzed under state contract law. *See Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, 2000 WL 1854903, at *3–4 (S.D.N.Y. July 12, 2000); *cf. Bartsch v. Metro–Goldwyn–Mayer, Inc.*, 391 F.2d 150, 153 (2d Cir.1968) (analyzing scope of contract under state contract principles).

11. Under New York law, "an agent's authority may be actual or apparent. An agent has apparent authority when conduct by the principal leads a third party to believe that the agent has authorization to act on behalf of the principal. If a third party reasonably relies upon such acts, the principal will be bound by the conduct of his agent." *Holtzbrinck Publ. Holdings, L.P. v. Vyne Communs.*, 2000 WL 502860, at *7 (S.D.N.Y. Apr.26, 2000) (internal quotations and citations omitted). Mr. Barnes works as a producer for Defendant Carter, and produced another song on the same album on which the Izzo song appears. Defendant Carter allowed Mr. Barnes to bring

whether her recording would be used in the Izzo song and, if it was used, what sort of compensation and recognition she would receive. Most significantly, there was no understanding that Plaintiff's recording would actually be used in the final version of the Izzo song. The mere fact that Plaintiff left the physical recording in the possession of the Defendants "cannot be considered an implicit acceptance of any request for a license because no such request was outstanding." *Viacom Int'l, Inc. v. Fanzine Int'l, Inc.*, 2000 WL 1854903, at *4 (S.D.N.Y. July 12, 2000). Thus, this case is clearly distinguishable from other situations where courts have typically found an implied license. Those cases generally involve a previous agreement by the two parties that the licensee use the licensor's work and a subsequent dispute concerning either incomplete payment or an inability to agree on exact written terms. Here, in contrast, there was no agreement that the Defendants would use the Plaintiff's recording of the Vocal Phrase. Defendants told Plaintiff that her recording might not even be used; therefore there could be no "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Express Indus. and Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 693 N.Y.S.2d 857, 715 N.E.2d 1050, 1053 (1999).

Even assuming that Plaintiff's conduct created an implied license, Plaintiff clearly terminated any implied license prior to filing this suit and is thus still entitled to damages for copyright infringement. "A material breach of a covenant will allow the licensor to rescind the license and hold the licensee liable for infringement for uses of the work thereafter." *Graham v. James*, 144 F.3d 229, 237 (2d Cir.1998). Rescission is permitted if the breach is "material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir.1989) (citing *Callanan v. Powers*, 199 N.Y. 268, 284, 92 N.E. 747 (1910)). Although rescission is an extraordinary remedy, this Court finds that the Plaintiff would be entitled to rescission because her desire to receive public acknowledgement of her contribution to the Jay Z song and thus publicize her career, "go[es] to the root of the agreement between the parties." *Id.* Thus, even assuming that Defendants did not willfully intend to breach their agreement with Plaintiff, rescission is still appropriate. *See also Holtzbrinck Publ. Holdings, L.P. v. Vyne Communs.*, 2000 WL 502860, at *5 (S.D.N.Y. Apr.26, 2000) (an implied license is revocable absent consideration).

Plaintiff's attorney contacted Defendants on October 9, 2001, informed them that their use of the Vocal Phrase infringed on Plaintiff's copyright, and demanded that the Defendants "immediately cease and desist any manufacture, sale and use" of the Vocal Phrase. (Pl.Ex. 5). Such notice would clearly terminate any license, entitling Plaintiff to damages for Defendants' use of the Vocal Phrase after that date.

### B. *Joint Authorship*

██ In addition to her claims of copyright infringement, Plaintiff argues that

---

a guest to his recording studio, and Mr. Barnes originally suggested to Mr. Carter that Plaintiff record the Vocal Phrase. (Hearing Tr. at 88). Mr. Barnes informed Ms. Ulloa that he was the producer for the Izzo song. (Ulloa Dep. at 209–10). A reasonable juror could find that it was reasonable for Ms. Ulloa to conclude, based upon this information, that Mr. Carter authorized Mr. Barnes to act on his behalf with respect to her role in the Izzo song. (Ulloa Aff. ¶ 5).

she is a joint author of the Izzo song.[12] Although, an original contribution by a sound engineer, editor, or producer *may* result in a joint ownership between the record producer and a performing artist in a sound recording, *see* 1 *Nimmer* § 2.10[A][3], separate original contributions are not sufficient to support a claim of joint authorship. A "joint work" under the Copyright Act is one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. In order to find joint authorship, the Court must also find that the putative co-authors, at some time, shared an intent to be co-authors. *Childress v. Taylor*, 945 F.2d 500, 509 (2d Cir.1991). Here, Plaintiff cannot demonstrate that Mr. Carter (or the other Defendants) ever intended to share authorship with Plaintiff.

Plaintiff argues that summary judgment is inappropriate on this issue because "Jay Z recognized that Demme's melody would be merged with his contributions into an inseparable whole" and that this fact could lead a reasonable trier of fact to "conclude that Jay Z considers himself a joint author." (Pl. Mem. at 32). However, this argument misapprehends the requirement that the parties must intend to share the rights of authorship rather than merely intend to enter into a relationship that results in the creation of a copyrightable work.

> [E]qual sharing of rights should be reserved for relationships in which all participants fully intend to be joint authors.

The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright.

*Childress*, 945 F.2d at 509.

As Plaintiff has proffered no evidence to support an argument that Jay Z ever intended to share authorship with the Plaintiff, Defendant's motion for summary judgment on this issue is granted. *Compare Thomson v. Larson*, 147 F.3d 195, 202 n. 17 (2d Cir.1998) (collecting cases that found joint authorship based upon objective indices of co-authorship intent). The Court also dismisses Plaintiff's claim for an accounting in connection with Defendants' exploitation of Izzo. *See Lindsay v. Wrecked and Abandoned Vessel R.M.S. TITANIC*, 1999 WL 816163, at \*7 (S.D.N.Y. Oct.13, 1999) ("The duty to provide an accounting from profits obtained runs only between co-owners of a copyright.").

## C. *Lanham Act*

█ Defendants also seek summary judgment on Plaintiff's Lanham Act violation, arguing that this claim "is entirely duplicative of her infringement claim." (Def. Mem. at 20). This Court agrees and grants Defendants' motion.

Plaintiff brings her Lanham Act claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which provides:

12. Defendants note that Plaintiff's claims of joint authorship conflict with her claims of copyright infringement, as a joint owner of a copyright may not sue his co-owner for infringement. *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir.1984). However, the Court reads Plaintiff's claim of joint authorship as a claim in the alternative to her copyright infringement claim. *See Maurizio v. Goldsmith*, 230 F.3d 518, 519 (2d Cir.2000) (noting that Plaintiff's complaint rested on two alternative and mutually exclusive theories: that Plaintiff is a joint author with Defendant and that Defendant has infringed on Plaintiff's copyright).

Any person who, on or in connection with any goods or services, . . . uses in commerce . . . any false designation of origin . . . which—is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin . . . of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action. . . .

To state a claim for damages under the Lanham Act, Plaintiff must allege (1) a false representation of the source of her sound recording, and (2) actual confusion by consumers as to the source. *See Agee v. Paramount Communications, Inc.,* 59 F.3d 317, 327 (2d Cir.1995) (citing *PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc.,* 818 F.2d 266, 271 (2d Cir. 1987)). Plaintiff's false representation allegation is based entirely on the fact that Defendants made unauthorized use of her sound recording without compensating her or recognizing her in the credits to the album. Such allegations are insufficient to support a Lanham Act claim. *Id.* Where, as here, a Plaintiff's claims under the Lanham Act "essentially track those asserted under copyright law" and Plaintiff's "claim of false originality" on the part of the defendants "does not venture beyond that implicit in any allegedly false copyright," the Lanham Act claim will be dismissed as duplicative of her copyright claim. *Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 633 (S.D.N.Y.2000). As Plaintiff does not allege any "affirmative action of falsely claiming originality beyond that implicit in any allegedly false copyright," *Weber v. Geffen Records,* 63 F.Supp.2d 458, 464 (S.D.N.Y.1999), her Lanham Act claim is dismissed, and it is not necessary for the Court to address Plaintiff's claims of consumer confusion.

## D. *Unjust Enrichment*

Defendants move for summary judgment on Plaintiff's claim of unjust enrichment on the grounds that it is preempted by the Copyright Act. (Def. Mem. at 23–24). As Plaintiff has failed to respond to this motion, the Court decides it unopposed.

As noted above, factual disputes regarding the validity of Plaintiff's copyright remain. If a jury finds that Plaintiff has no copyright in the composition or sound recording of the Vocal Phrase or that she licensed her copyrights to Defendants, then her claim of unjust enrichment is not preempted by the Copyright Act. Therefore, the Court denies Defendants' motion to dismiss this claim, construing Plaintiff's claim for unjust enrichment as a claim that is made in the alternative to Plaintiff's copyright infringement claim.

## E. *Bifurcation*

Defendants also seek to bifurcate the case and "require plaintiff to establish defendants' liability prior to allowing plaintiff to inquire into profits earned in connection with" the Izzo song. (Def. Mem. at 24). This motion is denied and the parties are directed to commence damages discovery immediately.

## *CONCLUSION*

For the reasons stated above, Plaintiff's claims for joint authorship and false designation of origin under the Lanham Act are dismissed. The parties are to complete all damages discovery no later than March 26, 2004. All motions in limine, proposed voir dire, and proposed jury instructions are to be submitted no later than April 23, 2004. The parties are directed to appear before the Court on May 3, 2004 at 2:00 p.m. for a final pre-trial conference. Trial will com-

mence at 10:00 a.m. on Tuesday, May 11, 2004.

SO ORDERED.